IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PAMLAB, L.L.C., and METABOLITE LABORATORIES, INC., | ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) | SECTION ___ |
| v. | ) ) | MAGISTRATE DIV. __ |
| BROOKSTONE PHARMACEUTICALS, L.L.C. a/k/a ACELLA PHARMACEUTICALS, L.L.C. | ) ) ) ) | **JURY DEMANDED** |
| Defendant. | | |

## ORIGINAL COMPLAINT

Plaintiffs Pamlab, L.L.C. ("Pamlab"), and Metabolite Laboratories, Inc. ("Metabolite"), (collectively, "Plaintiffs") file this Original Complaint against Defendant Brookstone Pharmaceuticals, Inc. a/k/a Acella Pharmaceuticals, L.L.C. ("Defendant" or "Brookstone") for false advertising and unfair competition under Section 43(a) of the Lanham Act, common law unfair competition, and common law misappropriation.

**PARTIES**

1.      Pamlab is a limited liability company organized under the laws of Louisiana, having its principal place of business in Covington, St. Tammany Parish, Louisiana.  Pamlab is a fully integrated pharmaceutical company that specializes in the development of prescription medical foods that are marketed and sold nationally.  Among the products Pamlab markets is Metanx® ("METANX") an orally administered prescription medical food for the dietary management of endothelial dysfunction in patients with diabetic peripheral neuropathy.  Unlike vitamins containing folic acid, METANX contains the active, naturally occurring form of folate (L-methylfolate), along with vitamin B6 (pyridoxal 5-phosphate) and vitamin B12(methylcobalimin) used by the body, and it is available by prescription only.

2.      Plaintiff Metabolite Laboratories, Inc. ("Metabolite") is a corporation existing under the laws of the State of Colorado, with its principal place of business at 301 Garfield Street, Unit 2-West, Denver, Colorado, 80206.  Metabolite is the owner of all right, title, and interest in United States Patent No. 6,528,496, entitled "Compositions treating, preventing, or reducing elevated metabolic levels" ("the '496  Patent")..

3.      Defendant Brookstone is a limited liability company organized under the laws of Georgia and having its principal place of business at 9005 Westside Parkway, Fulton County, Georgia 30004.  Brookstone markets, promotes, advertises, offers for sale, sells, and distributes an allegedly "generic" version of METANX ("the BROOKSTONE PRODUCT") labeled with the identifying number 42192-0311-90 in

National Drug Code ("NDC") format, to customers including wholesalers, retailers, chains, distributors, mail order houses, independent pharmacies, managed care organizations, and/or others throughout the United States, including in the Eastern District of Louisiana.  Brookstone may be served with process by serving a copy of the Complaint on its registered agent for service of process:  Kevin J. Loechl, 1150 Monarch Plaza, 3414 Peachtree Rd. NE, Atlanta, Georgia  30326.

4.     Upon information and belief, Defendant Brookstone is also known as Acella Pharmaceuticals LLC and transacts business within this judicial district and elsewhere under both names.

**JURISDICTION AND VENUE**

5.     This Court has original jurisdiction over the subject matter of this lawsuit under 28 U.S.C. §§ 1331 and 1338(a), because it arises under the patent laws of the United States, as well as under 28 U.S.C. § 1331 and 15 U.S.C. § 1221(a), because it concerns violation of section 43 of the Lanham Act, 15 U.S.C. § 1125.  Additionally, the amount in controversy exceeds $75,000 and involves citizens of different states.

6.     The exercise of personal jurisdiction in Louisiana is proper because acts giving rise to Plaintiffs' causes of action have occurred in the State of Louisiana and, more particularly, within the Eastern District of Louisiana.  More specifically, Defendant markets, promotes, advertises, offers for sale, sells, and/or distributes its products to customers including wholesalers, retailers, chains, distributors, mail order houses, independent pharmacies, managed care organizations, and/or others throughout the

United States, including in the Eastern District of Louisiana.  Defendant has purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased by consumers in the Eastern District of Louisiana.  Consumers have purchased and continue to purchase Defendant's products in the Eastern District of Lousiana.  Furthermore, Defendant falsely promotes its product as a generic equivalent to and substitute for METANX to customers including wholesalers, retailers, chains, distributors, mail order houses, independent pharmacies, managed care organizations, and/or others throughout the United States, including in the Eastern District of Louisiana.

7.     Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391.

## BACKGROUND
### The Research Leading to the Patent and the Patent License

8.     Homocysteine is an amino acid and a natural byproduct of the human body's conversion of methionine into cysteine.  If a body lacks the enzyme necessary to complete that conversion, or if the body lacks vitamins such as folic acid, $B_6$ and $B_{12}$, the concentration of homocysteine in the blood and urine increases.

9.     In recent years, hyperhomocysteinemia has been linked to repeatedly occurring venous thromboses and peripheral vascular disease including diabetic peripheral neuropathy.

10.     Studies have shown that a combination of vitamins $B_6$, $B_{12}$, and folate can lower homocysteine levels in most patients.  Thus, doctors increasingly recommend that

their patients with elevated homocysteine levels take supplements of vitamin $B_6$, vitamin $B_{12}$, and especially folic acid.

11.    In 2003, two hematology professors at the University of Colorado School of Medicine, Dr. Robert H. Allen and Dr. Sally P. Stabler, applied for a patent on a method for orally administering vitamin preparations which combine vitamin $B_{12}$ and folic acid, with and without vitamin $B_6$, for preventing and treating elevated serum homocysteine, cystathionine, methylmalonic acid, or 2-methylcitric acid levels.   United States Patent No. 6,528,496, entitled "Compositions treating, preventing, or reducing elevated metabolic levels" ("the '496 Patent"), was duly and legally issued to Drs. Allen and Stabler on March 4, 2003.   The '496 Patent is attached as Exhibit A.   The patent application that resulted in the issuance of the '496 Patent was a continuation application that claimed priority (through prior continuation and divisional applications) to a filing date of December 29, 1992.

12.    Dr. Allen formed Plaintiff Metabolite under the University of Colorado's guidelines.   The patents and applications leading to the '496 Patent, and later the '496 Patent itself, were assigned to Metabolite, so that Metabolite is the owner of all right, title, and interest in the '496 patent.

**Pamlab Develops METANX to Help Millions of Americans Suffering from Diabetes**

13.    Pamlab is an integrated specialty pharmaceutical company with development and commercial capabilities focused primarily on prescription medical foods.    Among its specific focus areas are the development of therapies for

homocysteine-related diseases and conditions, and the treatment of diabetic neuropathy. Diabetes currently affects more than 20 million Americans.  Diabetes results from the body's inability to properly metabolize glucose (sugar), and causes blood sugar levels to rise higher than normal.  High blood sugar levels can cause impaired vascular function which in turn causes a reduction in the oxygen and nutrients provided to the nerves. Diabetic neuropathy - a condition in which nerves are damaged as a result of reduced blood flow resulting from high blood sugar levels - is one of the most common and troublesome complications of diabetes.   By some estimates, 50-60% of diabetics eventually suffer some form of diabetic neuropathy and its accompanying symptoms, including numbness, tingling, and burning in the hands and feet.

14.    In January 2000, Pamlab entered into a license agreement with Metabolite (the "Patent License"), under which Metabolite granted Pamlab an exclusive license to make, use and sell certain oral vitamin formulations falling within the scope of the '496 patent and which combine vitamin $B_{12}$ and folate, with and without vitamin $B_6$.  Products made, used or sold by Pamlab under this license are subject to payment of a royalty on net sales to Metabolite.

15.    Pamlab began marketing METANX in 2004. Unlike folic acid-containing vitamins, which contain synthetic forms of folic acid that must undergo several metabolic steps to be converted into their natural, active forms before they can be used in the body, METANX's unique formulation provides the active form of folate (L-methylfolate), along with vitamin $B_6$ (pyridoxal 5'-phosphate) and vitamin $B_{12}$ (methylcobalamin) to

manage the distinct nutritional requirements of diabetic neuropathy patients who often experience numbness, tingling, and burning sensations in their feet. Each METANX tablet contains L-Methylfolate [6(S)-5-MTHF] (Metafolin®) 2.8 mg, pyridoxal 5'-phosphate 25 mg, and methylcobalamin 2 mg. METANX combats diabetic neuropathy by improving the overall health of the blood vessels and restoring normal blood flow in the vessels and capillaries that carry nutrients and oxygen to the nerves. It has been shown to be an effective treatment for diabetic peripheral neuropathy and lower extremity ulcerations such as diabetic foot ulcers.

16.     METANX's formulation and use falls within the scope of the '496 patent. Moreover, the presence of the dietary ingredient L-Methylfolate [6(S)-5-MTHF] (hereinafter "L-5-MTHF") is used by Pamlab as a unique selling point. L-5-MTHF is a source of folate, an essential human vitamin of the B complex. The unique benefits of L-5-MTHF come from the fact that it consists of a single diastereoisomer, among other things.

17.     Many products occur as mixtures of two or more diastereoisomers. Diastereoisomers have the same chemical composition and have the same atoms bonded to other atoms, but differ in the spatial arrangement of the atoms.

18.     The various diastereoisomers that are present in such mixtures may have radically different properties from one another. In some cases, one diastereoisomer can have a therapeutic effect, while another diastereoisomer is therapeutically ineffective. In the most severe instances, one diastereoisomer may be highly toxic while another

diastereoisomer may have incredible pharmacological utility. Thus, there are often great benefits to providing patients and consumers with a product that contains only a single diastereoisomer as opposed to a diastereoisomeric mixture.

19.    Diastereoisomers are distinguished from one another through naming conventions that reflect their different properties. One such naming convention uses a "D" in the name of the compound for one diastereoisomer and an "L" in the name of the compound to indicate a different diastereoisomer.

20.    The L-form (*i.e.*, L-5-MTHF) used in METANX is superior to the D-form (*i.e.*, D-5-MTHF) because the L-form is the naturally occurring predominant form of folate found in food and the human body. The L-form is the biologically active form of folate and has proven to have a high degree of bioavailability (the rate at which a drug or other substance is available at the targeted place in the body) in humans. In contrast, the D-form is an unnatural form of folate, from which humans are unable to benefit.

21.    L-5-MTHF is the pure diastereoisomeric form of folate used by cells in the body. In humans, this particular compound is the predominant form in circulation and transport into the tissues, and it is the only folate that can cross the blood-brain barrier.

22.    While the D-form is inactive as a source of folate nutritional activity, scientific evidence raises concerns that this inactive folate is not inert with respect to its *in vivo* behavior. For example, the presence of any of the D-5-MTHF diastereoisomer may compete with the uptake and activity of the L-5-MTHF diastereoisomer and therefore reduce the overall usability of the compound.

23.    There is also scientific evidence that the unnatural D-form accumulates in the human body, raising concerns in the medical community.

24.    Pamlab has expended substantial resources developing METANX.    In addition, Pamlab's representatives have met with doctors and other prescribers not only to provide information on the use and benefits of METANX, and also to provide doctors with samples of METANX.    Pamlab's efforts have succeeded to the extent that its sales of METANX are expected to exceed $119,000,000 by the end of 2009.

## Defendant Develops and Markets Its Knock-Off Product
## to Exploit METANX's Success

25.    Defendant is a Georgia-based pharmaceutical company that develops, manufactures, markets, and sells what it calls "niche generic pharmaceuticals," or "specialty generic products."    Defendant does not market its alleged generic equivalent drug products to physicians.    Rather, it convinces drug wholesalers, distributors, pharmacies, pharmacists and national drug databases that its products are generic substitutes for brand-name drugs.    Its sales result from "generic" substitution of its products for brand-name drugs.

26.    Upon information and belief, sometime in 2009, Defendant saw an opportunity to exploit the reputation and success of METANX by creating the BROOKSTONE PRODUCT, a knock-off prescription medical food.    Defendant labels the BROOKSTONE PRODUCT as containing "L-Methylfolate [6(S)-5-MTHF] (as Xolafin®) 2.8 mg, pyridoxal 5'-phosphate 25 mg, and methylcobalamin 2 mg."    A copy

of the BROOKSTONE PRODUCT's package insert is attached hereto as Exhibit B and incorporated herein.

27.    Upon information and belief, before November 12, 2009, Brookstone contacted national pharmaceutical and supplied those databases with information detailing and describing the BROOKSTONE PRODUCT.

28.    Upon information and belief, Defendant explicitly or implicitly represents that the BROOKSTONE PRODUCT has the same indications as METANX and/or that the BROOKSTONE PRODUCT is substitutable for METANX.

29.    Despite its label, Defendant does not use "L-Methylfolate [6(S)-5-MTHF]" in the BROOKSTONE PRODUCT.  Instead it uses a racemic methylfolate mixture that contains both the L and D forms of 5-MTHF.   Moreover, the BROOKSTONE PRODUCT contains more than twice the amount of racemic methylfolate, as the amount of L-5-MTHF contained in METANX.

30.    Moreover, upon information and belief, the BROOKSTONE PRODUCT contains less than two-thirds of the amount of pyridoxal 5'-phosphate listed on its label or that is contained in METANX.

### Defendant Markets the **BROOKSTONE PRODUCT** as a
### **Generic Substitute for METANX**

31.    Despite the fact that the BROOKSTONE PRODUCT does not contain dietary ingredient L-5-methylfolate (*i.e.,* L-5-MTHF), but rather the dietary ingredient D,L-5-MTHF, and that it contains a lesser amount of pyridoxal 5'-phosphate than

METANX, Defendant nevertheless markets the BROOKSTONE PRODUCT to drug wholesalers, distributors, pharmacies, pharmacists and others as a generic equivalent to and substitute for METANX. Defendant has had its knock-off product linked to METANX in drug databases that represent a major marketing communications channel to drug wholesalers, pharmacies and others, and that are used by pharmacists to decide which drug product to dispense when filling a prescription.

32. In its commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Defendant has made no effort to differentiate the BROOKSTONE PRODUCT from METANX other than on the basis of price. Specifically, in commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Defendant describes itself as a company marketing "generic" prescription drug products. Upon information and belief, in its commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Defendant states and implies that the BROOKSTONE PRODUCT is a generic version of METANX and labels its product as a generic equivalent to METANX. Upon information and belief, in its commercial advertising and promotion, Defendant does not inform drug databases, wholesalers, pharmacies, pharmacists or others in the pharmaceutical distribution chain that there are

no comparative studies showing that its knockoff is therapeutically equivalent to METANX.[1]

33. Defendant seeks to capture market share from METANX by encouraging generic substitution of the BROOKSTONE PRODUCT for METANX.

34. Defendant's efforts have had their intended effect; based upon Defendant's commercial advertising and promotion, drug databases as well as wholesalers, pharmacies and others have "linked" the BROOKSTONE PRODUCT as a generic equivalent to METANX. As a result of Defendant's commercial advertising and promotion, wholesalers and pharmacies in the Eastern District of Louisiana and across the country have ceased to purchase METANX, believing that the BROOKSTONE PRODUCT is now available as a generic substitute. This could not occur unless Defendant had successfully created the false impression among drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain that the BROOKSTONE PRODUCT is genuinely generic to and substitutable for METANX.

---

[1] Unlike the marketing of "branded" pharmaceutical products which often occurs in the open, the advertising of generic pharmaceutical products primarily consists of private communications with wholesalers, retailers and others, intended to make them aware of the availability of a "generic" product and to encourage them to "link" the generic product to the branded product in their databases. Although Pamlab is not privy to the communications between Brookstone and its customers; it expects that evidence of these and similar communications by Defendant will come to light through discovery.

**Defendant's Advertising is Literally False and Misleading**

35.     Notwithstanding Defendant's advertising and promotional claims on the BROOKSTONE PRODUCT's label, package insert and in other documents, the BROOKSTONE PRODUCT does not contain the same active ingredients in the same amounts as METANX.

36.     Although Defendant advertises and promotes the BROOKSTONE PRODUCT as containing the same form of folate contained in METANX, the BROOKSTONE PRODUCT does not use "L-Methylfolate [6(S)-5-MTHF]" in its formulation.  Instead, Defendant uses a racemic methylfolate comprised of both the L and D forms of 5-MTHF.   In contrast, METANX contains only L-5-MTHF; it does not contain any of the D form.   Moreover, the amount of D,L-5-MTHF contained in the BROOKSTONE PRODUCT is more than twice the amount of L-5-MTHF contained in METANX.

37.     Although Defendant advertises and promotes the BROOKSTONE PRODUCT as containing the same amount of pyridoxal 5'-phosphate as METANX, the BROOKSTONE PRODUCT contains only two-thirds of the amount of pyridoxal 5'-phosphate Defendant claims it contains, and that is contained in METANX.

## The BROOKSTONE PRODUCT is not a Generic Equivalent to
## or a Substitute for METANX.

38.    A pharmacist presented with a doctor's prescription for a brand-name product may fill that prescription by dispensing the product prescribed or an identical, "generic" version of the product.  This process is known as generic substitution.

39.    A generic product is identical – or therapeutically equivalent – to a brand name product in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.  Therapeutically equivalent products are both pharmaceutical equivalents and bioequivalents.

40.    Products are considered to be pharmaceutical equivalents if they contain the same ingredient(s), including the same active ingredient(s), they are of the same dosage form and route of administration, and they are identical in strength or concentration.

41.    Products are considered bioequivalent products if they deliver the active ingredients to the bloodstream at the same rate and with the same level of absorption.

42.    For pharmacists and other medical professionals, the requirement of bioequivalence ensures that a generic product substituted for the prescribed brand-name product is truly interchangeable and will provide the patient with the treatment the doctor ordered.  This is critical because the doctor, not the wholesaler, distributor or pharmacist, is responsible for making the appropriate treatment decisions and tracking the patient's progress.

43.     State law governs pharmacy practice, including generic substitution. Most state laws explicitly require that a substitute product be both pharmaceutically equivalent as well as bioequivalent, and hence "therapeutically equivalent" to the drug prescribed.

44.     Thus, pharmacists and other medical professionals expect that a product advertised, promoted and sold as a generic will be pharmaceutically equivalent, bioequivalent and therapeutically equivalent to the brand.

45.     Because the BROOKSTONE PRODUCT does not contain the same active ingredients in the same amounts as METANX, the BROOKSTONE PRODUCT is not pharmaceutically equivalent to METANX.

46.     Defendant has not published or, upon information and belief, performed or commissioned any studies demonstrating that its product delivers its active ingredients to patients at the same rate and in the same amount as METANX. Moreover, Defendant has not published or, upon information and belief, performed or commissioned any studies with regard to the effects of the D form of 5-MTHF in the human body when D,L- 5-MTHF is administered. In the absence of testing, the BROOKSTONE PRODUCT cannot be presumed to be bioequivalent and therapeutically equivalent to METANX. Indeed, the BROOKSTONE PRODUCT is not therapeutically equivalent to METANX.

47.     Plaintiffs have been and will continue to be harmed by Defendant's literally and impliedly false and misleading advertising and unfair competition. Defendant's marketing efforts have misled consumers into believing that its product is a generic equivalent to and substitute for METANX. As a result, substitutions of the

BROOKSTONE PRODUCT for METANX have eroded and will continue to erode METANX's sales and goodwill as well as Plaintiffs' revenues.

48.    Plaintiffs do not and cannot control the safety, effectiveness, or quality of Defendant's inferior product. Thus, doctors and patients who suffer bad experiences with the BROOKSTONE PRODUCT that is substituted for prescriptions of METANX are likely to think less of both Plaintiffs and METANX.

## COUNT 1:
## VIOLATION OF LANHAM ACT SECTION 43(A) (FALSE ADVERTISING)

49.    Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

50.    Defendant markets the BROOKSTONE PRODUCT to drug databases, wholesalers, pharmacies, pharmacists and others in interstate commerce as a generic to and substitute for METANX. Defendant intends for these potential customers to believe that the BROOKSTONE PRODUCT is generic to and substitutable for METANX, and to purchase the BROOKSTONE PRODUCT in place of METANX.

51.    Defendant's promotional claims about the BROOKSTONE PRODUCT are literally and/or impliedly false and misleading. The BROOKSTONE PRODUCT is not pharmaceutically equivalent to, generic to, or substitutable for METANX. Defendant's promotional claims violate Section 43(a) of the Lanham Act, which provides in relevant part that "any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact or misleading representation of

fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable to a civil action by any person who believes that he or she is likely to be damaged by such act."

52.     Additionally, Defendant is liable for false advertising under the Lanham Act because it intentionally induced and/or knew or had reason to know that drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain would falsely describe Defendant's product as generic to and a substitute for METANX to pharmacists, but continued to sell the products to those entities.

53.     By reason of Defendant's conduct, Plaintiffs have suffered, and will continue to suffer, damage to its business, reputations, and goodwill. Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to damages for Defendant's Lanham Act violations, an accounting of profits made by Defendant on sales of its product, and recovery of Plaintiffs' costs for this action.

54.     Defendant's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Pamlab to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

55.     Unless enjoined by this Court, Defendant's acts will irreparably injure Plaintiffs' goodwill and erode its market share. Pursuant to 15 U.S.C. § 1116, Plaintiffs

are entitled to preliminary and permanent injunctive relief to prevent Defendant's continuing acts.

**COUNT 2:**

**VIOLATION OF LANHAM ACT SECTION 43(A) (UNFAIR COMPETITION)**

56. Plaintiffs refer to and incorporate herein the allegations of Paragraphs 1-55.

57. Pamlab has become uniquely associated with METANX, and the public identifies Pamlab as the source for METANX.

58. Defendant has marketed and continues to market the BROOKSTONE PRODUCT as generic to and substitute for METANX, and in doing so, has deceived, misled, and confused consumers. This has enabled Defendant to trade off of Pamlab's reputation and good will.

59. Defendant's acts constitute unfair competition in violation of Section 43(a) of the Lanham Act.

60. Additionally, Defendant is liable for unfair competition under the Lanham Act because it intentionally induced and/or knew or had reason to know that drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain falsely describe the BROOKSTONE PRODUCT as a generic to and substitute for METANX to pharmacists, but continued to sell the products to those entities.

61. By reason of Defendant's conduct, Plaintiffs have suffered, and will continue to suffer, damage to their business, reputations, and goodwill. Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to damages for Defendant's Lanham Act violations,

an accounting of profits made by Defendant on sales of the BROOKSTONE PRODUCT, and recovery of Plaintiffs' costs for this action.

62. Defendant's acts are willful, wanton, and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiffs to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

63. Unless enjoined by this Court, Defendant's acts will irreparably injure Plaintiffs' goodwill and erode its market share. Pursuant to 15 U.S.C. § 1116, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Defendant's continuing acts.

<u>COUNT 3:</u>

**VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**

64. Plaintiffs refer to and incorporate herein the allegations of Paragraphs 1-63.

65. Defendant's conduct, including their false and misleading statements about the BROOKSTONE PRODUCT and METANX and palming off and improper substitution of the BROOKSTONE PRODUCT for METANX violates Section 51:1405(A) of the Louisiana Unfair Trade Practices and Consumer Protection Law (UTPCPL) which declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

66. The Defendants' unfair methods of competition and unfair or deceptive acts or practices include, but are not limited to, violations of Section 51:411 of the Louisiana Revised Statutes which provides in relevant part that, "[n]o person, with intent to sell or

in any way dispose of merchandise, . . . or anything directly or indirectly, to the public for sale or distribution, or with intent to increase the consumption, or to induce the public in any manner to enter into any obligation relating thereto, . . . shall make, publish, disseminate, circulate, or place before the public, or cause directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in this state, . . . an advertisement of any sort regarding merchandise, securities, service or anything offered to the public, which advertisement contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

67.    As a result of Defendant's violations of the UTPCPL, Plaintiffs have suffered and unless such acts and practices are enjoined by this Court, will continue to suffer, irreparable injury and damage to its business, reputation and goodwill for which it is entitled to relief.  In addition Plaintiffs are entitled to damages and attorney's fees for Defendants' UTPCPL violations.

## COUNT 4:
## CIVIL CODE ART. 2315

68.    Plaintiffs refer to and incorporates herein the allegations of Paragraphs 1-67.

69.    Defendant's tortious conduct, including its false and misleading statements about the BROOKSTONE PRODUCT and METANX and palming off and improper substitution of the BROOKSTONE PRODUCT for METANX render Defendant solidarily liable to Plaintiffs for damages to their business, reputation and goodwill.

## PRAYER FOR RELIEF

Plaintiffs prays for the following relief:

A.     A judgment and order that Defendant, its agents, servants, employees, attorneys, successors, and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from directly or indirectly falsely advertising or promoting the products or inducing others to substitute its product for prescriptions of METANX;

B.     A judgment and order that Defendant, its agents, servants, employees, attorneys, successors, and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from making or inducing others to make any false, misleading or deceptive statement of fact, or representation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation, or distribution of its product in such fashion as to suggest that the product is therapeutically equivalent to METANX, or can be freely interchanged with or substituted for prescriptions of METANX;

C.     A judgment and order that Defendant, its agents, servants, employees, attorneys, successors, and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from placing, and are ordered to remove, information linking its product to METANX in any drug dispensing databases in the United States;

D.     A judgment and order that Defendant include in any advertisement or promotion comparing the product with METANX, whether oral or written, a notice in location and typeface as prominent as the comparison itself, that its product "is not therapeutically equivalent to METANX. Therefore, the substitution of this product for METANX may violate state law";

E.     A judgment and order that Defendant take corrective action to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities of the products or METANX, including without limitation the placement of corrective advertising to prevent the inducement of others from substituting the BROOKSTONE PRODUCT for prescriptions of METANX;

F.     A judgment and order granting Plaintiffs such other relief as the Court may deem appropriate to prevent the trade and public from deriving any erroneous impression concerning the nature, characteristics, or qualities of the BROOKSTONE PRODUCT or from inducing others to substitute the BROOKSTONE PRODUCT for prescriptions of METANX;

G.     A judgment and order requiring Defendant to pay Plaintiffs damages under 15 U.S.C. § 1117(a) and La.R.S. 51:1409 in the amount of Plaintiffs' actual and consequential damages and any profits of Defendant resulting from its advertisements and marketing of its products;

H.     A judgment and order requiring Defendant to pay Plaintiffs all of their reasonable attorneys' fees, costs and expenses, including those available under 15 U.S.C. §1117(a) and any other applicable law;

I.     A judgment and order finding that this is an exceptional case and requiring Defendant to pay Plaintiffs additional damages equal to three times the actual damages awarded Plaintiffs pursuant to 15 U.S.C. § 1117(a), as well as all of Plaintiffs' reasonable attorneys' fees under 15 U.S.C. § 1117(a) and any other applicable law;

J.     A judgment and order requiring Defendant to pay Plaintiffs pre-judgment and post-judgment interest on the damages awarded; and

K.     Such other and further relief as the Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that all issues be determined by jury.

Respectfully submitted,

By:   /s/ Robert S. Rooth
        Robert S. Rooth, T.A. (#11454)
        Corinne A. Morrison (#9737)
        Stephanie W. Cosse (#31677)
        **CHAFFE McCALL, L.L.P.**
        2300 Energy Centre
        1100 Poydras Street
        New Orleans, LA 70163-2300
        Telephone: (504) 585-7000
        Telecopier: (504) 544-6088

Saul H. Perloff (TX #00795128)
Katharyn A. Grant (TX #24050683)
**FULBRIGHT &**
**JAWORSKI L.L.P.**
300 Convent Street, Suite 2200
San Antonio, Texas 78205
Telephone: (210) 270-7163
Telecopier: (210) 270-7205

**ATTORNEYS   FOR   PLAINTIFFS,**
**PAMLAB,         L.L.C.        AND**
**METABOLITE    LABORATORIES,**
**INC.**